J-S19033-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.J.R.L., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.Y.R., MOTHER | : | No. 3581 EDA 2018 |

Appeal from the Order Entered November 8, 2018
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): 52-FN-326-2012
CP-51-DP-0002046-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: L.R.-J., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.Y.R., MOTHER | : | No. 3582 EDA 2018 |

Appeal from the Decree Entered November 8, 2018
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): 52-FN-326-2012
CP-51-AP-0000589-2018

BEFORE: LAZARUS, J., KUNSELMAN, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.: **FILED JUNE 11, 2019**

A.Y.R. (Mother) appeals from the decree entered November 8, 2018, which terminated involuntarily her parental rights to her daughter, L.J.R.J.[1] (Child), born in July 2017.[2] Mother also appeals from the order entered that

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Child's name appears on her birth certificate as L.J.R.J. However, her name also appears in the record as L.R.-J.

[2] The trial court entered an additional decree terminating involuntarily the parental rights of R.H.J. (Father). Father neither appealed the termination of his parental rights, nor participated in this appeal.

same day, which changed Child's permanent placement goal to adoption. We affirm.

The record reveals that the Philadelphia Department of Human Services (DHS) filed an application for order of protective custody of Child on August 2, 2017. DHS averred that it received a general protective services report the day after Child was born. The report indicated that, while Mother and Child tested negative for illegal substances at the time of Child's birth, Mother had tested positive for phencyclidine (PCP) and cocaine approximately three months earlier in April 2017. Further, the report indicated that Mother had received only sporadic prenatal care, that she suffered from untreated mental health issues, that she was homeless, and that she had two other children who were not in her care. The trial court granted protective custody of Child to DHS and entered a shelter care order on August 4, 2017. The court adjudicated Child dependent on August 14, 2017.[3]

On July 18, 2018, DHS filed petitions to terminate Mother's parental rights to Child involuntarily, and to change Child's permanent placement goal from reunification to adoption. The trial court held a hearing on November 8, 2018, at the conclusion of which it announced that it would

_____

[3] The trial court entered an order finding aggravated circumstances on May 7, 2018, due to the termination of Mother's parental rights involuntarily to a previous child in May 2013.

terminate Mother's rights.[4] The court then entered a termination decree and an order changing Child's goal to adoption. Mother timely filed notices of appeal on December 5, 2018, along with concise statements of errors complained of on appeal.[5]

Mother raises the following claims for our review: whether the trial court erred in terminating Mother's parental rights involuntarily pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8) and 23 Pa.C.S. § 2511(b). Mother's Brief at 3.[6]

We review Mother's claims mindful of our well-settled standard of review.

_____

[4] Shannon Sherwood, Esquire, served as Child's legal counsel and guardian *ad litem* during the proceedings. Attorney Sherwood reported that Child, who was one year old at the time, was nonverbal and unable to express her preferred outcome. N.T., 11/8/2018, at 40, 122. However, Attorney Sherwood noted that Child appeared happy in her foster home. *Id.* at 40. She argued in support of terminating Mother's parental rights during the hearing. She also filed a brief on appeal supporting termination and the change of goal.

[5] This court *sua sponte* consolidated the appeals. *Per Curiam* Order, 1/7/2019.

[6] While Mother appealed the order changing Child's permanent placement goal to adoption, she did not include a challenge to the goal change order in her statement of questions involved or in the argument section of her brief. Thus, Mother waived any challenge to that order. *In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.… Further, it is well-settled that issues not included in an appellant's statement of questions involved … are waived.").

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b)[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights to Child pursuant to subsections 2511(a)(1),[7] (2), (5), (8), and (b).

---

[7] At the conclusion of the hearing, the trial court indicated that it would not terminate Mother's "parental rights pursuant to 2511(a)(1)." N.T., 11/8/2018, at 124. Nonetheless, the court's decree terminated Mother's parental rights pursuant to, *inter alia*, subsection 2511(a)(1).

We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
>
> ***

23 Pa.C.S. § 2511(a)(2), (b).

We first consider if the trial court abused its discretion by terminating Mother's parental rights pursuant to subsection 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Here, the trial court found that Child had been in foster care for more than fifteen months at the time of the hearing and that Mother continued to lack adequate housing. N.T., 11/8/2018, at 125-26. The court further found that Mother engaged in illegal drug use as recently as September 2018.[8] *Id.* at 126-27. The court observed that Mother voluntarily left her

_____

[8] The trial court stated incorrectly that it could not consider Mother's efforts to remedy her parental incapacity that occurred after DHS filed its termination petition on July 18, 2018, in considering whether termination was appropriate under subsection 2511(a)(2). *See* N.T., 11/8/2018, at 126 ("The petitions for this case were filed on July 18th. So, technically, I should not consider any of mom's efforts to address the issues that she was having, mainly her drug and alcohol issues."). The provision that the court was referring to applies only to termination pursuant to subsections 2511(a)(1), (6), and (8). *See* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are
*(Footnote Continued Next Page)*

prior drug and alcohol treatment program six weeks prior to the hearing, but had not yet begun treatment at a new program. *Id.* at 127. Therefore, the court concluded that DHS met its burden of proof with respect to subsection 2511(a)(2).

Mother challenges the trial court's findings by asserting that there is no evidence in the record that she engaged in illegal drug use during or before her pregnancy, or that she received inadequate prenatal care. Mother's Brief at 14. Mother further asserts that there is no evidence in the record that she has untreated mental health issues "serious enough to make her incapable of parenting her child." *Id.* While Mother acknowledges that she tested positive for illegal substances repeatedly, she maintains that the court could not hold this against her, because her drug use occurred after Child entered foster care, and it was therefore not a condition that caused Child to be without essential parental care, control, or subsistence. *Id.* at 15. Finally, Mother contends that it was improper for the court to hold her lack of appropriate housing against her, citing the portion of subsection 2511(b) providing that a court may not terminate parental rights based solely on environmental factors beyond the control of the parent. *Id.* at 15-16.

_(Footnote Continued)_ ⸻⸻⸻

first initiated subsequent to the giving of notice of the filing of the petition.").

We discern no abuse of discretion by the trial court. During the hearing, Community Umbrella Agency (CUA) case manager, Janae Alexander, testified that Mother's case goals included attending court hearings, visiting with Child, participating in mental health treatment, participating in drug and alcohol treatment, and complying with the Achieving Reunification Center (ARC). N.T., 11/8/2018, at 98.

Concerning Mother's compliance with her goals, Ms. Alexander testified she struggled to contact Mother after she began working on this case in August 2017. *Id.* at 91. Ms. Alexander was initially unable to contact Mother because the phone number in the referral was incorrect. *Id.* Fortunately, Mother contacted Ms. Alexander and provided another phone number. *Id.* However, whenever Ms. Alexander attempted to call the new phone number, it was disconnected. *Id.* Ms. Alexander recalled, "When mom would make outreach to me … it was from different numbers, and I would always call those numbers back. Most of the time, it was someone at the bus stop who, you know, let her use the phone to get in contact with me." *Id.* at 91-92. Because of Ms. Alexander's difficultly contacting Mother, "a few months" went by before Mother was able to visit with Child. *Id.* at 92. Mother visited with Child sporadically in October 2017, but did not have any further visits until June 2018. *Id.* at 92, 105. Ms. Alexander agreed

that this pause in visits occurred because Mother was either difficult to contact or was attending inpatient drug and alcohol treatment.[9] *Id.* at 111.

With respect to mental health treatment, Ms. Alexander testified that Mother reported attending Community Council in June 2018. *Id.* at 96-97. However, Ms. Alexander was unable to confirm this because Mother refused to sign the necessary consent forms. *Id.* In addition, Mother had an appointment to complete a mental health evaluation at Gaudenzia but never attended.[10] *Id.* at 104, 109.

As for Mother's drug and alcohol treatment goal, Ms. Alexander testified that Mother participated in drug screens at the Clinical Evaluation Unit. *Id.* at 94. Mother tested positive for PCP on August 14, 2017; June 25, 2018; July 18, 2018; July 26, 2018; August 3, 2018; August 29, 2018; and September 20, 2018. *Id.* at 94-95. She tested positive for PCP and cocaine on May 7, 2018, and July 11, 2018. *Id.* at 94. In May 2018, Ms. Alexander learned that Mother was attending inpatient drug and alcohol

_____

[9] Even after Mother's visits resumed, the record indicates that she failed to attend four of the visits without calling in advance or providing an excuse. N.T., 11/8/2018, at 85-86.

[10] Ms. Alexander acknowledged that she was unsure why Mother had a mental health goal. N.T., 11/8/2018, at 103-04. She stated, "It was just something that was court-ordered, so, I followed through with it." *Id.* Mother testified that she receives Supplemental Security Income because, since she was "very young, I always had something like anxiety issues …. They want to label it as ADHD." *Id.* at 80-81.

treatment at Kirkbride and that the program planned to discharge her successfully in approximately five to seven days.[11] *Id.* at 93, 109-10.

Finally, Ms. Alexander testified that she referred Mother to ARC on two occasions for parenting and housing services. *Id.* at 95, 99. ARC discharged Mother unsuccessfully after the first referral due to her lack of participation. *Id.* at 96. When Ms. Alexander referred Mother a second time, ARC declined to place her in parenting classes. *Id.* Ms. Alexander explained, ARC said it "believed that [Mother] didn't have the capability of sitting in a parenting class, so, [it] asked that she be evaluated, but [it] said she refused the evaluation."[12] *Id.* With respect to housing, Mother reported to Ms. Alexander that she lives in a shelter. *Id.* at 99. Mother has lived in three different shelters since August 2017, when Child was placed into the protective custody of DHS, and at one point was homeless. *Id.* at 103, 108.

Accordingly, the record supports the trial court's conclusion that Mother is incapable of parenting Child and that she cannot or will not

_____

[11] After completing Kirkbride, Mother began attending intensive outpatient treatment at Chances on July 23, 2018. N.T., 11/8/2018, at 53-55. Mother's therapist at Chances, Robin Superville, testified that she attended treatment inconsistently and tested positive for PCP and cocaine. *Id.* at 54-55. She tested positive on each of her seventeen drug screens. *Id.* at 56. Mother left Chances against the program's advice on September 27, 2018. *Id.* at 52-53. Mother testified that she planned to attend further treatment elsewhere and that she was "just about to do all the paperwork." *Id.* at 79-80.

[12] Mother later completed a parenting class at Chances. N.T., 11/8/2018, at 56-57.

remedy her parental incapacity pursuant to subsection 2511(a)(2). By the time of the hearing on November 8, 2018, Child had been in foster care for over fifteen months, nearly Child's entire life. During that time, Mother failed to maintain consistent contact with DHS and failed to visit Child consistently. Mother also failed to obtain housing and refused an evaluation at ARC. Compellingly, Mother tested positive repeatedly for illegal substances, including PCP and cocaine. While Mother now attempts to argue that the court could not hold her drug use against her because it occurred after Child entered foster care, this argument is meritless. Even accepting for the sake of argument that Mother's drug use arose after Child's placement,[13] it still prevented her from gaining the stability necessary to care for Child and therefore caused Child to be without essential parental care, control, or subsistence. Finally, we reject Mother's argument that the court erred by terminating her parental rights to Child based on her lack of housing. The relevant portion of subsection 2511(b) provides that a court may not terminate parental rights "solely on the basis of environmental factors such as inadequate housing … if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b). It is apparent that the court did not

---

[13] Mother's testimony during the hearing contradicts this claim, as she stated that she first began attending drug treatment "a week before I was pregnant." N.T., 11/8/2018, at 80. Moreover, as noted *supra*, Child was initially placed in DHS protective custody, in part, because Mother had tested positive for PCP and cocaine while pregnant with Child.

terminate Mother's parental rights based solely on her lack of housing. Moreover, the record does not support a finding that Mother's lack of housing was beyond her control. DHS referred Mother to ARC for housing services and the record does not indicate that she made any effort to utilize the services or otherwise attempt to obtain appropriate housing. Mother's claim does not entitle her to relief.

Next, we consider if the trial court abused its discretion by terminating Mother's parental rights involuntarily pursuant to subsection 2511(b). We apply the following analysis.

> S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)).

In this case, the trial court found that Mother acted appropriately during visits with Child, but that "being appropriate during visits, of which I believe the testimony was there [were] 16, is not the same as being a parent." N.T., 11/8/2018, at 129. The court noted the lack of evidence that Mother has been involved in Child's life and reasoned that, while Mother and Child do share a bond, it is not a parent-child bond. ***Id.*** at 129-30. The court emphasized that Child has a very positive relationship with her pre-adoptive foster mother, with whom she has lived for nearly her entire life. ***Id.*** at 130. Therefore, the court concluded that termination of Mother's parental rights would not cause Child to suffer irreparable harm, and would best serve Child's needs and welfare pursuant to subsection 2511(b). ***Id.***

In response, Mother directs our attention to testimony presented during the hearing indicating that she and Child share a bond. Mother's Brief at 19. Mother also asserts that the trial court "erred in her § 2511(b) analysis in focusing upon Mother's conduct and her status as non-custodial parent rather than the emotional relationship between Mother and Child." ***Id.*** She argues that any child in foster care must rely by necessity on his or her foster parent and that this natural reliance on a primary caretaker is not the same thing as a parent-child bond. ***Id.*** at 20-21. Mother insists that Child was only one year old and nonverbal at the time of the hearing, and

- 13 -

did not exhibit any "nonverbal cues" that she would prefer living with her foster mother rather than Mother. *Id.* at 21.

We again discern no abuse of discretion. CUA visitation coach, Shantae Pressley, testified that she began supervising Mother's visits with Child in June 2018. N.T., 11/8/2018, at 82. Ms. Pressley observed fourteen visits in total. *Id.* at 82-83. She reported that Mother interacts well with Child. *Id.* at 89. Child appears comfortable with Mother, and Ms. Pressley believed that Mother and Child share a bond. *Id.* at 90. Nonetheless, Child does not appear upset when she separates from Mother at the conclusion of visits. *Id.* at 83. In addition, Ms. Pressley did not believe that Child would suffer irreparable harm if the trial court terminated Mother's parental rights because Child shares a bond with her pre-adoptive foster mother, with whom she has lived since she entered foster care. *Id.* at 85.

Similarly, Ms. Alexander testified that Child did not appear upset during the approximately eight months that Mother was not visiting with her. *Id.* at 105. Concerning the one visit between Mother and Child that she observed, Ms. Alexander testified that Child seemed reluctant to interact with Mother. *Id.* at 100-01. She recalled, "[Child] cried. She ran back to me, because she didn't want to be in her presence, but mom pulled out the lollipop to bribe her, and that's when [Child] began to interact with her, due to the lollipop." *Id.* at 101. She opined that Child has "a really close bond"

with her foster mother and that adoption would be in Child's best interest. *Id.* at 101-02.

Thus, the record demonstrates that terminating Mother's parental rights would best serve Child's needs and welfare. Child has never lived with Mother and has spent time with Mother only sporadically during her short life. While the record contains some evidence that Child gets along well with Mother, it also indicates that Child has no difficulty separating from her when their visits are over. Accordingly, the record belies Mother's insistence that she and Child share a relationship significant enough to warrant preservation of her parental rights. In addition, it is clear that Child shares a parent-child bond with her pre-adoptive foster mother, with whom she has resided since she entered foster care. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily. Therefore, we affirm the court's November 8, 2018 decree and order.

Decree affirmed. Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/11/2019*